Good morning, Your Honours, and may it please the Court. There is not time to address all the issues involved in this appeal, so I would like to restrict myself to the 865-865 patent issues and leave the rest for the briefs. Although if the Court has questions about either, I obviously will try to answer them. At the heart of the issue in the 865 patent case is the Barton application, and at the heart of the Barton application is a single sentence, and that single sentence basically says, Performing such a codon substitution for the remaining portion of the coding region might still be expected to increase the efficiency of expression, although perhaps less dramatically. I submit, Your Honours, that either that or any other evidence is substantial evidence sufficient to sustain a jury verdict. Substantial evidence looking through the prism of the burden of proof, which is a theory proposing a burden of proof. There are two basic reasons. One is that even that sentence does not suggest using at least 60% G or C nucleotides. Secondly, the totality of the evidence actually teaches a way. It doesn't teach toward making that substitution of 60%. First of all, the Barton application is totally silent on the actual number of at least 60%. Where that number comes from is testimony of Barton. And what Barton says, and he agrees that that was speculation using, he uses that word, speculation, using the whole sequence. It comes, he says, from looking at the codon table and using every preferred codon. That's the key to his testimony. He uses every preferred codon. The evidence is overwhelming that even he, in his application, didn't use every preferred codon for his sequence. He had nine non-preferred codons with ten nucleotides different from what he otherwise would have in the G and C range. He didn't know the length of what he was doing. He didn't know if it was 600 or 650 amino acids. He never synthesized the gene. His testimony about 60.1, which he admitted was speculation, is totally inconsistent with the actual record of his case. His application not only does not teach, even if you follow that instruction, you don't get at least 60. The only other evidence they relied on was testimony of Della Porta and testimony of Messick. Della Porta, all he did was predict. He uses the word predict. He never calculated it. He never synthesized the gene. And moreover, he based his use, again, just as Barton did, only on preferred codons. And if you look at page 818 of the district court's opinion, she too said that that's what they were focusing on, was using only preferred codons. I submit that that is not substantial evidence of at least 60%. But at least significantly, as significantly, the totality of the evidence teaches away from using 60%. First of all, the sentence that they are focusing on is in a paragraph, paragraph 28 of the Barton application. And the first 9 tenths of that application basically says that it's unwise, it's unlikely, we will not likely get any improvement beyond the first 25 codons. Basically telling you not to go the full length, but only 25 is likely to produce any benefit. And the information, which is spread out actually in the blue brief, shows that when you go from low to high, from 59 to 138 amino acids, you actually don't get any improvement. In fact, the kill numbers go down. It goes down from 83% to 46% to 25%, suggesting that there's no reason, no desirability, and no recommendation to do the full length. Moreover, the testimony of Barton makes it clear, coupled with the other evidence, that in fact, if you increase it, you might have deleterious effects if you go the full length. That was one of the reasons he gave for not going the full length. And he also has another reason was he said he felt he had solved the problem. He didn't have to go any further. And that's wholly aside from the fact that Barton doesn't mention corn. It uses tobacco. For sure, it has a general statement that it will work in other plants. But the European corn borer is much more resistant against DT than is the tobacco corn worm, which is the subject of the Barton application. Now, when you consider all of what I've said in the context of all the other art, which shows at most 50% with the Fischhoff patent, which is a Monsanto patent, basically saying if you have more than five G's and C's in a row, that could be deleterious. You should avoid that. Every piece of evidence in the case suggests not going to 60. So for those reasons, I submit that the district court's denial of the Jamal motion on this patent is wrong. It's a matter of law. It should be reversed. Let me talk briefly about the written description issue. The district court gave essentially no explanation other than the fact that substantial evidence could support the jury verdict in A24 note one. She basically summarily dismissed Syngenta's argument that the 60% limitation was incorporated by reference. I submit that as a matter of law, she was wrong. The question of whether something was incorporated by reference and to what extent is a legal question. It's not a fact question. And as a matter of law, I submit that the district court heard. There are two statements in the 865 specification. One of them, right at the beginning, says that the applicants are incorporating the 136 patent in its entirety. Those are the words, in its entirety. There's another statement in the patent. It says, a complete description of the creation of Syngenta genes may be found in, and they mention the application number, which led to the 136 patent. And it says, quote, which is herein incorporated by reference. Now these statements are sufficient to incorporate by reference the discussion in the 136 patent of the 60% limitation. Because in fact, the 136 patent says expressly, expressly, that the preferred embodiment is at least 60% of GAs plus Cs. And it gives examples of 64%, 64.6%, 64.8%. So how does Monsanto respond to these arguments? First of all, Monsanto says, well, these incorporations by reference statements are inadequate since they're not specific enough. And moreover, the incorporated material is tied to specific codons. Not so. The 136 patent is incorporated in its entirety. I know of no case, including the case that Monsanto relies on, advanced display, which says you can't incorporate something in its entirety. And in fact, the MPEP rule makes it clear that you don't need to do very much more than what we've done. All you need to do is identify the, make it clear, you didn't use the magic words, incorporation by reference, we did. And you need to identify the patent involved, and we did. But moreover, the creation of said gene or genes, even if you don't rely on incorporated in its entirety, you cannot look at something in terms of how you create the genes without knowing what gene you're creating. You need to know what the target is in order to know what you're creating. So the identification of at least 60%, or 64%, 646, 648, is critical to knowing how to create the genes. So we submit, we have satisfied any test, the MPEP test, the advanced display test. And that's sufficient to incorporate it by reference. Mr. Dunner, if you're stopping in place with respect to the 865, could I ask you just very quickly about the claim construction issue with respect to the 185 and the 100? And specifically with respect to the argument that Monsanto makes that you didn't adequately preserve your claim construction argument. In your yellow brief, I think it is 39, 35, 36, you cite a passage from your claim construction brief in the lower court in which you say you laid out your position with respect to claim construction. After that brief was filed, however, in a colloquy with the district court, which is found at 3623 through 3625, I won't read it, but I will summarize it, I hope, accurately. Your trial counsel said that the position of Syngenta was that a majority of the change between the BT native gene and the synthetic gene had to be due to the listed protons. That seems to be a different position from the one you're taking now and from the one that you took in the passage that is in the yellow brief. My question to you is, why shouldn't we look to the subsequent statement made by counsel to the court in the colloquy as the position of Syngenta with respect to claim construction? Your Honor, the answer to that is in footnote 10 on pages 36 and 37 of the yellow brief. And if you look at footnote 10, you will see that it starts out, that trial counsel for Syngenta argued the 6% calculation is based on all the GNC nucleotides in the coding sequence, not just listed codons, and then he goes on. He also explained that in order to determine whether the sufficient number limitation was met, one compares the accused sequence to the native sequence, determines which codons have been changed to listed codons. The newly changed codons are then examined to determine whether a sufficient number of them are used in reaching 60%. That is basically the argument we're making here in this court. Well, but I didn't see where he made the last point. I read your footnote and looked at the various references in the discussion. I didn't see that last point, which is the argument you're making now, made by trial counsel before the trial counsel. Your Honor, it's on page 3625 of the appendix at 2439 of that page. Well, I looked at that, and here's what he says. He says, and what we're saying is you analyze to see if you use a sufficient number, which in the 185 patent was when they were arguing about maze-optimized, was a majority of maze-optimized codons. There's the majority term again. I don't see the argument we're now making, which is all it has to be is enough to trip the 60% wire, so to speak, to get you over the 60%, whether it's a majority or less than a majority or even only one, which if I understand your argument now is that's what is sufficient to satisfy the claims. Your Honor, it starts out by saying that, so what we're looking at is the difference. How do you get from 38 to 60? The majority is an additional limitation on top of that. You look at the difference. You look at the native codon, and the patent describes, defines optimized codons as those starting with the native codon and changing to include preferred codons, and it says you look at the difference. How do you get from 38 to 68? That's what we're saying right now. You look at the native. This has two things in it. One is the majority. At some point during the prosecution of this case, the applicants made clear in order to satisfy the examiner that the listed codons had to be a majority of the codons providing the GNC, but in addition to that, we talked about a difference. You look at the native codon. You look at the accused codon, and you look at the differences between those two, and that's what we're talking about here. All right, Mr. McArdle. Your Honor, have I used up all my rebuttal time? We'll give it back to you. Thank you. Thank you, Your Honor. I would hope to talk about two dispositive issues this morning. One is the obviousness question of the 865 patent, and the other is the claim construction question of the 185-100. The point about the obviousness verdict is that we have here an undisputedly properly instructed jury which heard evidence from experts and others of skilled in the art about what the prior art taught, and there was ample evidence under the highly referential substantial evidence standard for the jury to find that the prior art taught everything that appeared in the 865 patent. That prior art includes but isn't limited to art, and there was, again, expert and skilled person evidence about what the Barton taught, including that it taught in that crucial sentence that Mr. Donner read, to use all plant-preferred codons, and the Barton application makes clear that the particular list it sets out is a table drawn from a number of different plants, but it says expressly, as more sequences are identified, more genes are sequenced, one might well want to use plant-specific codon tables, including expressly, it says, males. There is no, was no evidence, or to put it in terms of the substantial evidence standard, the jury certainly did not have to conclude what Mr. Donner is now arguing as a kind of factual point today, that the 60% level wouldn't be reached by following the statement that Barton expressly makes. Dr. Delaporta and Dr. Messing both said, as did Dr. Barton, that if you simply use all of the most preferred codons in that table, you would get 60%. That is substantial evidence. I would say there was additional evidence as well. Part of the evidence was the prior art, Barton aside, about increasing G plus C content. And if you look at the yellow brief, the reply brief, carefully, it asserts several times, but does not cite anything that says that that other prior art said, stop below 60, stop at 50. It's unquestionable that the particular examples that were set out in that prior art didn't go up to 60, but it nowhere says you really ought to stop. So there's no teaching away either in Barton or in the other prior art. The third kind of evidence that we discussed in our brief to support the obviousness verdict is testimony. Testimony in particular from Syngenta's witnesses, Dr. Bailey-Saras and Dr. Chilton. Let me just mention the Dr. Chilton point because it clarifies a little something in the brief. There's a quote that we set out in our brief where Dr. Chilton says, it was obvious at the time to do what everybody was doing. And part of the quote is it was obvious to, you need to make it, and the transcript says IGC. Well, that is in fact means high GC. That was a transcript of a videotape deposition read at the trial. And the transcript of the actual deposition is correct, saying high GC. The transcription in the trial appendix has a typo that says high GC. But we have, in addition to Barton and the prior art, the testimony of Dr. Chilton and Dr. Bailey-Saras, which the jury was entitled to conclude, recognized the obviousness of creating a gene that would have 60% G plus C, even if no one at the time specifically identified the G plus C character of the old and perverted code. Let me turn, if I might, to the 185-100 claim construction issue. Now, at the outset, of course, there's no dispute that, about infringement independent of claim construction. This is just a claim construction issue. And the overarching point here is this, that throughout the prosecution, and the specification as well, the applicants made crystal clear that this invention was tied to the maximal use of May's preferred codings. And in the particular claims we have here, to the specifically listed ones. Now, Syngenta, I think it's fair to say, has really been all over the map trying to wipe out that central concept of the invention. In the district court, it said just count G plus Cs. But it was saying that at a time before it had an adverse invalidity verdict on the 865. So its idea back in the district court was to reference the G plus Cs in the 185-100 as really the same as in the 865. And as soon as the 865 was held invalid, Syngenta, first in its blue brief and then in its yellow brief here, began an effort to try to distinguish the claim constructions of the 185 and the 1800 from the 865. Now, in the blue brief, its principle effort said what you have to look and see is would the 60% level be reached without the listed codons, or any of the listed codons, a kind of but-for, and strictly speaking, a necessity test. Are some of those codons necessary to reach the 60% level? We pointed out in our brief that that's an argument that was not anywhere made below the blue argument. When, in the yellow brief, Syngenta came back and said, could I interrupt for just a second? I don't mean to stop you from going on to that point, but why doesn't the passage between 35 and 36 of the yellow brief at least, especially the last sentence, generally convey that notion? Here's why, because I think the sentence that's quoted in 35-36 is about a sufficiency point. The argument, the claim construction proposed in the blue brief is a necessity point. All the language in that quote in 35-36 in the yellow says it uses the word enough, which is a synonym for sufficient. That does not say anything to suggest that you have to figure out what the level would have been without it. It's a simple logical opposite to say that their blue brief point uses the term otherwise, uses the term without, I forget what the third term is, so that it would tip the balance, which is to say you have to make an inquiry into whether the listed codons or some of them are necessary to get over the level. Necessity is the opposite of enough, of sufficiency. That's why that wasn't an argument that gave anybody in the district court any idea that you had to look at a comparison between some counterfactual hypothesized gene sequence, count the G's and C's in that, then compare them to a different gene sequence and ask whether the ones that are listed make the difference. Some of the listed ones, of course, are inevitably going to appear because some of them are unique for a particular amino acid. If we were to construe the language such that is used in this passage to convey a notion of necessity as well as sufficiency, do you think that in later colloquy between counsel and the court that whatever was conveyed by this passage was abandoned in favor of a different construction? No, I don't think so, because I think the only thing that was being done in the colloquy was to say we have two requirements that need to be met. One is a counting requirement. This is Syngenta's argument in that colloquy. And the other is something about sufficiency. But at that point, there's no definition offered as sufficiency. It just says whatever sufficiency means, it's satisfied because a majority of the ones that are changed are listed ones. That, as the blue brief, I think, makes perfectly clear, is not a claim construction point at all. Because you don't see in the blue brief any reference to majority except where in the infringement section, not in the claim construction section. There's no argument, therefore, being made, even in the blue brief, let alone back in the district court, about some concept of majority defining the term. In the blue brief, it may be made as an infringement issue as opposed to claim construction. My question, though, is when Mr. Grievous made that argument to the district court, was he making a claim construction argument and insinuating the notion of majority as a requirement? I don't read it that way at all. Because, in fact, the testimony on which he was relying, pointing back to a short passage in the Bailey-Serra's testimony, was simply testimony that says, that marched through in a very short number of questions and answers, do we have a sufficient number to reach the 60%? Yes, we do. In fact, the majority does. But there's no argument made in that colloquy about the claim construction. And I think one reason is that this majority would come out of nowhere. In particular, there's no reference in the prosecution history to a majority concept being a claim construction. The only point that's made in the prosecution history about a majority is this. It's that the examiner initially, quite incorrectly, thought that a maze-optimized sequence could still have a majority of non-maze-referred codons. And Syngenta, quite correctly, twice told the examiner, no, no, you're wrong about that. And the examiner eventually withdrew. The point of distinguishing all of the prior art could not possibly have been and wasn't on the basis of using a majority of maze-preferred codons. That's not what Syngenta's applicants said in distinguishing adding over and over and over again. And indeed, it couldn't have. Because if you look at adding and you simply mimic the mix of codons from the codon table, you will get a majority. It wouldn't, in fact, have distinguished adding to say, we use a majority. Naturally, because if you use the most preferred ones 71% of the time, mimicking plants, and you simply add them all up, you will, in fact, get a majority from adding. So that was not a point that was offered low as a claim construction. It wasn't argued in the blue brief as a claim construction. It was not a point in the prostitution history that was made when majority was referenced. And the last point I'll make about this is that in the end, there are really two places in the claim language that capture the central concept of maximal use of listed codons. One of them is the sufficient number language, which the district court relied on as ultimately the only sensible construction of this language. The language says, we're listing these codons for a reason. We're not just saying 60%. And ultimately, the only sensible interpretation you can give to the fact that you're listing them is that those are the codons that have to make up the 60%. Even apart from that, the maze-optimized language, which Njenta now leaves undisputed, is equivalent to the selected-for-optimized expression in maze language. Those are the same. That language would, particularly in light of the prosecution history, independently encompass the same concept. Perhaps I can say one clarifying word about the 60% written description point. Recall that the 60%, and this is now back from the 865 and the Invalidity, just to clean up the point. The 60% GC limitation was added at the 11th hour, almost 10 years into the prosecution, added late in the prosecution, basically in light of the introduction in the commercial marketplace and the loss that Njenta experienced in another patent. That late addition of 60% in the 865 patent comes with not a single reference to 60% G plus C in the specification of the 865. And so the argument that Njenta makes comes down to a question of incorporation by reference. And here are the two points that I want to make about that incorporation by reference. The first is that even if there was an incorporation for written description purposes, the most that was incorporated, and this is at 7095 of the appendix, the passage in the 136 that refers to 60%, is a set of particular kinds of sequences, maze-optimized, partially maze-optimized, that include, that would reach 60%. There is no incorporation of the general class of 60% G plus C, the whole class, no matter what codons you use. And the second point is this, that when we pointed out in our brief that the applicants in the prosecution history said, here is the purpose for which we incorporate, they said we were not incorporating for the purpose of defining our invention. And when the applicants at the very end of the process said, once again, we're now going to rely on the 136, 715 application, same thing, and pointed to specific passages in that 136, figures 23A and following, those passages have nothing whatsoever to do with the makeup of the sequence. They have to do with the ELISA tests and other matters. They don't have to do with the sequence. If the court has no further questions. I do have one other question. In your characterization of the meaning of maze-optimized in the claims you referenced back to the specification, which refers to both pure maze-optimized and partial maze-optimized, why wouldn't it be fair to read the term maze-optimized as not limiting itself to one of those two, but rather meaning maze-optimized to some degree or to a complete, i.e. pure, extent? Well, I don't think that that would be a fair reading of what maze-optimized means from the spec alone. Partially maze-optimized at column 9, 5 through 10 is very specifically about a canaric gene. A part may be maze-optimized and then the rest we're going to attach something else. But every place that we are doing changes, we're doing it by using all maze-preferred codons except to the extent we need to fiddle around in a very minor way for the actual synthesis process. But the prosecution history, I think, resolves any possible confusion about that because the prosecution history says over and over again the reason that we are different from what Adaine in particular was doing is that every time we see a particular result exit, we don't think about what codon ought to go there. We know what codon ought to go there. It's the one that's maze-preferred. And that tells you repeatedly what maze-optimized means. And they said it said as much in the prosecution history. Thank you. Thank you. Your Honors, on the question of the 185 and 100 patents and maze-optimized and whether or not you only look at the preferred codons to count the 60%, I would direct Your Honors to the claim language itself. And if you look, for example, at page 31 of the Blue Brief where they have the 185 patent, you'll see it starts out maze-optimized in that claim and the same thing is true of the 100 patent. It's used three times. And the first time it says, comprising a maze-optimized nucleic acid coding sequence that encodes a CRY1AB protein. The point is that those words must mean the same thing all the way through. If all you count are the preferred codons, you cannot satisfy that term. Because even Monsanto admits that you don't have 100% preferred codons. On page 62 of their brief, it says limited exceptions to permit cloning and the like. The fact is that you cannot satisfy this claim language and use 100% Gs plus Cs because those terms must mean the same thing all the way through. Secondly, when I'd like to go back to the 865 patent, I heard Mr. Taranto say that there was a witness who said it was obvious to use this 60% sequence. All that the witness said was it was obvious to use a codon table. It was obvious to make the genes more corn-like. But so did all those references want to make it more corn-like. And the Fishoff reference, which is a Monsanto reference, cautioned against too much Gs plus Cs. Those were his words. Too much. He avoids runs of Gs plus Cs that are greater than Y. Unless there are some questions, Your Honor. I think that's all I have. Thank you.